[Cite as *In re T.S.*, 2016-Ohio-5273.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

In re T.S.

Court of Appeals No. WD-16-016

Trial Court No. 2015 JC 0720

**DECISION AND JUDGMENT**

Decided: August 3, 2016

* * * * *

Mollie B. Hojnicki-Mathieson, for appellant.

Paul A. Dobson, Wood County Prosecuting Attorney, and
Charles S. Bergman, Chief Assistant Prosecutor, for appellee.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Wood County Court of Common

Pleas, Juvenile Division, that terminated the parental rights of appellant mother and

granted permanent custody of her minor child T.S. to appellee Wood County Department

of Job and Family Services ("the agency").[1]  For the following reasons, the judgment of the trial court is affirmed.

{¶ 2} The agency first became involved with mother in July 2011, when it received temporary custody of T.S. ("T."), then four years old, and his sister (case No. 2011 JC 0745).  T. was placed in foster care and a case plan was developed to aid in reunification with mother.  The agency was unable to locate a relative placement until mother's sister came forward and was granted legal custody on February 12, 2013.  Services for mother were removed from the case plan and an amended case plan was developed to assist T.'s aunt with the continued goal of reunification.

{¶ 3} On September 2, 2015, the agency filed a complaint alleging T. was a dependent child after maternal aunt informed the agency that she was no longer willing and able to care for the child.  T. had been placed in the Children's Resource Center's Residential Unit as there were no other family members willing or able to care for him.  An emergency hearing was held on September 4, 2015; maternal aunt appeared but mother did not.  Mother was rumored to be living in Lima, Ohio, and the agency had not had contact with her since maternal aunt obtained custody.  According to maternal aunt, mother had not visited with T. in over 20 months, despite being permitted to do so.  Mother had also been held in contempt for non-payment of child support during that period.  T. was found to be a dependent child and temporary custody was continued with

---

[1] The father of T.S. is unknown.  The trial court terminated the parental rights of "any unknown father of T.S."

2.

the agency. A court-appointed special advocate/guardian ad litem ("GAL") was appointed for T. and he was returned to his original foster family, where he remained at the time of the permanent custody hearing. It should be noted that mother failed to attend any court proceedings in this matter, including adjudication and disposition hearings and the permanent custody hearing.

{¶ 4} An adjudicatory hearing scheduled for October 13, 2015, was continued in order to perfect service on mother. Service was perfected but mother failed to appear at the November 3, 2015 hearing. The court again continued the hearing, this time until November 17, 2015. Mother again failed to appear, although appointed counsel appeared on her behalf. As a result of the hearing, T. was adjudicated a dependent child, existing temporary orders remained in effect and disposition was set for December 8, 2015.

{¶ 5} On December 7, 2015, the agency filed a motion for permanent custody of T. The disposition hearing was held as scheduled, however, on December 8. Mother failed to appear. Temporary custody was continued with the agency and all existing orders remained in place. Hearing on the motion for permanent custody was scheduled for March 10, 2016. On January 22, 2016, mother's attorney filed a motion for in camera interview with T. prior to the permanent custody proceedings. The motion was granted and an in camera interview took place on March 7, 2016.

{¶ 6} On March 10, 2016, the permanent custody motion was heard. Mother failed to appear but was represented by counsel. The agency called mother's caseworker as its sole witness. Mother did not offer any witnesses.

3.

**{¶ 7}** Melissa Tokar testified that she became T.'s caseworker in 2011 after the first case was opened. T. was subsequently placed with his aunt for nearly three years and, when his aunt gave up legal custody of the child in September 2015, Tokar was assigned to T.'s case again. Tokar testified that T. was currently in foster care with the same family with which he had been placed when first removed from his mother's home in 2011. Mother did not see T. while he was living with his aunt and Tokar stated that mother had not seen him since he was returned to the agency's custody.

**{¶ 8}** At the outset of the 2011 case, mother was diagnosed with obsessive compulsive disorder and bipolar disorder with mixed mania and was recommended for psychiatric services, individual counseling and case management services. Mother's compliance with the mental health recommendations was inconsistent and providers indicated she was not making progress on treatment goals. It also appeared that she was not refilling her medication for extended periods of time. Mother refused to allow caseworkers to help her clean her home, which had no working plumbing and was filled with trash with no more than a narrow path through the rooms, and would insist on meeting with them elsewhere. Her compliance with scheduled meetings was sporadic. Tokar testified that, from 2011 to the current time, mother failed to successfully complete any of her case plan services.

**{¶ 9}** With regard to the instant case, Tokar testified that mother told her that she had not addressed any of her mental health issues as identified in the original case and was not active with any services. Mother talked about getting a job but never provided

4.

Tokar with verification of employment. Tokar stated that mother had not taken action to successfully complete any of the recommendations in her most recent case plan, amended October 2, 2015. Tokar provided mother with lists of low-income housing and talked to her about applying for Social Security benefits but mother did not follow through. When it was discovered that mother was not taking her medication regularly, agency staff offered to count her pills for her but mother said that would be an invasion of her privacy. Agency staff also talked to mother about assistance with car repairs and about obtaining a free cell phone but, again, mother did not follow through.

{¶ 10} Tokar explained that before the agency received temporary custody of T. in September 2015, mother filed a contempt motion against her sister alleging that she was denied visitation. A hearing on the motion was scheduled but mother did not attend, despite her attorney leaving her messages as to the date and time. After the agency received custody of T. on September 3, 2015, the agency attempted to contact mother using information that appeared on her contempt motion, which included a post office box and a street address in Lima, Ohio. Approximately one and one-half months after the agency regained temporary custody, Tokar heard from mother and offered to meet with her. Tokar told mother that the agency was quickly moving toward permanent custody and cautioned her that time was running short to resolve various issues. Mother was elusive about her address and told Tokar to send mail to her post office box. Tokar attempted to schedule an appointment with mother to discuss her mental health services and a home study but mother stated she was moving in November and wanted to wait

5.

until after that. Mother then agreed to meet with Tokar on November 13 but, despite repeated calls from Tokar, she did not respond and the meeting never took place. Mother finally called Tokar in mid-January 2016, after the motion for permanent custody had been filed, and demanded to be placed on T.'s case plan. At that time, mother said she planned to move to Bowling Green in February. Tokar did not hear from mother again until February, when she left some phone messages at the agency. Mother did not leave a call-back number, however, and the number from which she called Tokar was blocked. Tokar attempted to reach mother at another number, but that phone was no longer in service. Tokar finally reached mother on Friday, March 4, 2016, six days before the permanent custody hearing. At that time, mother reported she still had not moved to Bowling Green. Mother did not attend the March 10, 2016 permanent custody hearing.

{¶ 11} At the time of the permanent custody hearing, T. was involved with psychiatric services, partial hospitalization services and individual counseling. Tokar reported that T. was making some progress through his counseling. Tokar stated that T. told her that he wished to be adopted by his foster parents, with whom he was very bonded. Further, the foster parents had asked to be considered for adoption.

{¶ 12} Two guardian ad litem reports were admitted into evidence. T.'s previous and current GALs noted that T. was happy in his foster home, was bonded with the family, and hoped to remain there. Additionally, they reported that T.'s foster parents were providing T. with an environment helpful in addressing his behaviors and needs. They further noted that while mother said she wanted to reunify with T., she

6.

acknowledged being unable to do so at the time because she lacked a job, stable housing or transportation. Both GALs recommended permanent custody with the agency.

{¶ 13} Also admitted into evidence was a January 27, 2016 report from T.'s therapist at the Children's Resource Center which summarized T.'s history with the Center since June 2013. The therapist commented that T. presented with symptoms arising from a history of "chronic neglect * * *, living in unsafe and filthy conditions, both disrupted and dysfunctional attachment with his biological mother, lack of relationship with his biological father, history of out-of-home placement, instability and uncertainty in living arrangement and lack of contact with his biological mother in over two years." The therapist stated that T.'s experiences have likely impacted his brain development, causing difficulty with such things as social skills, emotions management, decision-making and self-regulation. She recommended continued weekly individual counseling sessions as well as regular psychiatry appointments.

{¶ 14} Tokar also testified that the agency had sent out several letters inquiring as to relative placement but received no positive responses.

{¶ 15} On March 14, 2016, the trial court filed a detailed judgment entry in which it ordered that the parental rights of both of T.'s parents be terminated and that permanent custody of T. be granted to the Wood County Department of Job and Family Services. It is from that judgment that mother appeals, setting forth the following assignment of error:

7.

A.  FIRST ASSIGNMENT OF ERROR:  The trial court abused its discretion in awarding permanent custody of T.S. to the Wood County Department of Job and Family Services.

{¶ 16} In support of her sole assignment of error, mother asserts that the record does not support a conclusion that T. could not have a legally secure placement with mother or that permanent custody is not in the child's best interest.  Appellant argues that filing her motion to show cause regarding alleged denial of contact with T. by her sister showed that she was taking steps to be involved in T.'s life.  The record reflects, however, that mother did not attend the hearing scheduled on her own motion.

{¶ 17} In granting a motion for permanent custody, the trial court must find that one or more of the conditions listed in R.C. 2151.414(E) exist as to each of the child's parents.  If, after considering all relevant evidence, the court determines by clear and convincing evidence that one or more of the conditions exists, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.  R.C. 2151.414(B)(1).  Further, pursuant to R.C. 2151.414(D), a juvenile court must consider the best interest of the child by examining factors relevant to the case including, but not limited to, those set forth in paragraphs 1-5 of subsection (D).  Only if these findings are supported by clear and convincing evidence can a juvenile court terminate the rights of a natural parent and award permanent custody of a child to a children services agency.  *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996).  Clear and convincing evidence is that which is sufficient to produce in the

8.

mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford*, 161 Ohio St.469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 18} In its judgment entry, the trial court found, pursuant to R.C. 2151.011(C), that T. had been abandoned by his mother and his father. Further, the trial court found, pursuant to R.C. 2151.414(E)(1), that mother demonstrated a lack of commitment toward T. by failing to regularly support, visit or communicate with the child or by other actions showing an unwillingness to provide an adequate permanent home for T. The trial court concluded that clear and convincing evidence established that placing T. in the permanent custody of the agency was in the child's best interest. In support of that conclusion, the trial court noted that T.'s interaction with mother had been limited and inconsistent at best for the past four and one-half years; that, during the in camera interview, T. expressed a desire to be adopted by the foster family; that T. was clearly in need of a legally secure placement; that mother was unable to properly care for T. for the foreseeable future and that since returning to the foster home T.'s behavior issues were being successfully addressed.

{¶ 19} Our review of the record shows that the trial court considered all of the relevant factors under R.C. 2151.414, as summarized above. We further note that the agency's evidence was undisputed, as mother did not call any witnesses at the hearing and did not make an appearance, despite adequate notice of all proceedings.

9.

{¶ 20} The record reveals that mother showed a lack of effort and commitment to the reunification process. It is clear from the record that mother made no progress with her case plan and no effort to visit with T. for an extended period of time, thus warranting the finding of abandonment. Evidence was undisputed that mother failed to attend any hearings involving custody and care of T. over a period of several years, failed to maintain contact with the agency or make herself available to discuss T.'s case, and admitted to Tokar in 2015 that she did not have permanent housing, a job or a car. Mother also failed to provide financial support for T. It is also clear that, while T. suffered a myriad of ill effects from the first four years of his life spent with mother, he began to show improvement in many respects in foster care as set forth above. As explained by T.'s therapist, T. is in need of continued therapy from professionals. The record further reflects that T.'s foster parents are making progress with his care and development and are interested in adopting him.

{¶ 21} Based on the foregoing, we find that the trial court's decision granting permanent custody of T. to the agency was supported by clear and convincing evidence. Accordingly, appellant mother's sole assignment of error is not well-taken.

{¶ 22} Upon consideration whereof, the judgment of the Wood County Court of Common Pleas, Juvenile Division, is affirmed. Costs of this appeal are assessed to appellant pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                             _____

                                                                     JUDGE

Arlene Singer, J.

                                                       _____

Thomas J. Osowik, J.                                  JUDGE
CONCUR.

                                                                      _____

                                                                  JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.